```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3   MICHAEL NIEMIS,            )
                                )    8:20-cv-2956-WFJ-JSS
 4            PLAINTIFF,        )    Tampa
                                )    June 23, 2021
 5            v.                )    9:30 a.m.
                                )
 6   CCC INTELLIGENT SOLUTIONS, )
     INC.,                      )
 7                              )
              DEFENDANT.        )
 8
                  TRANSCRIPT OF TELEPHONIC MOTION HEARING
 9            BEFORE THE HONORABLE WILLIAM F. JUNG
                    UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Plaintiff:
12       MR. EDWIN LEE LOWTHER
         MR. JOSEPH HENRY HANK BATES
13       Carney Bates & Pulliam, PLLC
         519 West 7th Street
14       Little Rock, AR 72201

15   For the Defendant:
         MR. JASON R. BURT
16       MR. GEORGE C. CHIPEV
         Latham & Watkins, LLP
17       555 Eleventh Street N.W., Suite 1000
         Washington, DC 20004-1304
18
         MR. JOSEPH H. VARNER, III
19       Holland & Knight, LLP
         100 North Tampa Street, Suite 4100
20       Tampa, FL 33602

21
     Court Reporter:            Tracey Aurelio, CRR, RMR, RDR
22                              Federal Official Court Reporter
                                801 N. Florida Avenue, 15th Floor
23                              Tampa, Florida 33602
                                (813) 301-5448
24
              Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1  _____

2      (Proceedings commenced at 9:30 a.m.)

3          THE COURT:  Good morning.  This is Judge Jung in

4  20-cv-2956.

5          May I have appearances first for plaintiff and then

6  for the defense.

7          MR. LOWTHER:  Yes.  Good morning, Your Honor.  This

8  is Lee Lowther on behalf of the plaintiff.

9          THE COURT:  Counsel.

10         MR. LOWTHER:  And I'm joined by Hank Bates.

11         THE COURT:  Thank you.

12         MR. BURT:  Good morning, Judge.  You have Jason Burt

13  from Latham & Watkins on behalf of the defendant, CCC

14  Intelligent Solutions.  Joining me this morning is George

15  Chipev also with Latham, and Joe Varner down there in Tampa.

16         THE COURT:  Welcome, everybody.

17         We are here on two pending motions.  Any housekeeping

18  issues before we start on the motion for judgment on the

19  pleadings and motion to compel?  I don't hear any.

20         MR. BURT:  Not from defendant.

21         THE COURT:  Thank you.

22         MR. LOWTHER:  This is Lee Lowther.  None from the

23  plaintiff either.

24         THE COURT:  Thank you.

25         Okay.  So I have read everything.  Please know that.

1   We have on the motion for judgment on the pleadings

2   Document 47, which is a motion.  The response is Document 52.

3   There is a reply at Document 61.  And then there was a

4   demonstrative I reviewed filed recently at Document 68.  I

5   have reviewed and printed all those.  Please assume I've read

6   those.

7          Then on the motion to compel, that's at 53, there's

8   the opposition at 64 by the defendant, and then a reply at 66.

9   So why don't we just address -- I'm not going to rule on this

10  call.  So no one needs to worry about that.  But I find these

11  oral presentations helpful even though we have read

12  everything.

13         Why don't we just start then.  We will hear from the

14  movant on the -- the defendant on the motion for judgment on

15  the pleadings.  And then we'll hear from Mr. Lowther or -- I

16  assume Mr. Lowther or plaintiff's lawyer in response.  And

17  then we will have a brief rebuttal, very brief on that one,

18  and then we will go to the motion to compel.

19         And there's no time limits, counsel.  Just the normal

20  rule that all good lawyers are concise.  And I remember the

21  previous work on this case and I've read your pleadings.

22         So with that I will recognize either Mr. Burt or

23  Mr. Chipev for the motion for judgment on the pleadings.

24         MR. BURT:  Good morning, Your Honor.  And thank you.

25  This is Mr. Burt on behalf of the defendant.  We appreciate of

1   course, the Court's time this morning.  I'm more than happy to

2   answer any of the Court's questions as we proceed.

3          Your Honor, regarding the motion for judgment on the

4   pleadings, as you know we moved for judgment on both the

5   third-party beneficiary claim and on the tortious interference

6   claim.  I'd like to begin with the third-party beneficiary

7   claim.  And I'll be referring, Judge, to the demonstrative aid

8   that was filed last night.  And I'll be referring to specific

9   slides that are included in that aid.

10          Beginning with the third-party beneficiary claim,

11   Judge, the dispositive point is that no amount of discovery

12   can change what is plain in the contract.  And that is that

13   there is an expressed disclaimer of any intent of the

14   contracting parties to benefit any third party.

15          Now, referring to slide two, Judge.  And what the law

16   says, Florida law is clear in two important respects.  First,

17   the Eleventh Circuit has explained the contracting parties'

18   intent to benefit the third parties must be specific and must

19   be clearly expressed in the contract in order to endow the

20   third-party beneficiary with a legally enforceable right.  And

21   that's the *Bochese v. Town of Ponce Inlet* case from 2005.

22          Judge, the cases since then, both state and federal,

23   applying these principles are legion and they're consistent.

24   Both state and federal cases have made clear that because the

25   requirement is that the intent to benefit must be specific and

1    clearly expressed, it cannot be inferred and it cannot be

2    supported merely by circumstantial or disputed evidence.

3            This is the other point that the *Bochese* court made

4    in that second quotation on slide two where it said, "In the

5    absence of any specific mention of Mr. Bochese in the

6    contract, it would be extraordinarily difficult for him to

7    establish that under Florida law he was an intended

8    beneficiary since an intent to benefit a third party, which

9    must me inferred from contradicted circumstantial evidence,

10   cannot be characterized as apparent, direct, or primary."

11           And that quote -- or excuse me -- the Eleventh

12   Circuit was quoting there the *Hewko* case v. *Genovese* from the

13   Florida District Court of Appeals in 1999.

14           So, Your Honor, given that this intent must be

15   specific and clearly expressed, the corollary legal principle

16   that is dispositive here is that where there is a disclaimer,

17   an expressed explicit disclaimer in the contract, that the

18   parties do not intend to benefit the third party.  That's the

19   end of the inquiry regardless of what other provisions of the

20   contract might suggest.

21           And referring to slide three, Judge, we have listed

22   here just some of the cases applying this legal principle,

23   dismissing claims for a third-party beneficiary where there

24   was an expressed disclaimer in the contract.  And, Your Honor,

25   that's the dispositive point here.  And it's the reason that

1   the 12(c) is warranted with respect to the third-party

2   beneficiary claim.  There is not one case to the contrary.

3   Where there's an expressed contractual disclaimer, that is the

4   end of the question.

5           Plaintiff has no response to this point.  He cannot

6   and does not dispute this law.  Instead, as I'll describe in a

7   moment, he attempts to misconstrue the language of the

8   contract in attempt to create confusion about what it says.

9   That cannot defeat what is claimed, and that is that there is

10  a disclaimer of intent.

11          And referring to slide four, Judge, we've listed

12  here, we have included the section from the contract,

13  Section 18.18, which makes clear that the contracting parties,

14  which in this case was CCC and USAA, which is the parent of

15  Garrison, did not intend any third-party beneficiaries to

16  benefit from the contract.

17          That disclaimer states, "Any warranty, obligation,

18  remedy, indemnification, commitment or liability of a party

19  under or by virtue of this agreement is solely intended for

20  the benefit of the other party and is enforceable or

21  recoverable by the other party only, and no other entity is an

22  intended third-party beneficiary under this agreement."

23          Judge, this language is dispositive.  Discovery

24  cannot change what this provision states.  In the words of the

25  Florida Court of Appeals just months ago in the *Reconco* case,

1    this disclaimer, quote, "Expresses a clear and manifest intent

2    not to benefit the plaintiff."  It is clear, Judge, that CCC

3    and USAA intended that all rights, obligations and liabilities

4    under the contract are intended solely for the other

5    contracting parties.

6         And I would note, Judge, that this language is

7    similar to the language found in other cases which courts have

8    held expresses an intent not to benefit a third party.  I

9    refer Your Honor to the *Adams* case and the *Wolf* case which are

10   cited in our briefs and included in the list of cases on slide

11   three.

12        For these reasons, Judge, judgment on Rule 12(c) is

13   warranted.  And that's all Your Honor need consider.  There is

14   an expressed disclaimer.  And under Florida law that is the

15   end of the story.

16        Now, plaintiff has offered two arguments to try to

17   get around this disclaimer, neither of which is persuasive and

18   neither of which undermines in any respect what the disclaimer

19   says.  What plaintiff first argues in the 12(c) opposition is

20   that the clause that begins "and no other entity" changes

21   everything.  He says what this means is because the entity is

22   defined in a specific way in the contract that does not

23   include individuals, that means that all the parties intended

24   was to limit entities from being third-party beneficiaries.

25        Now, two points defeat this argument.  First, this

1  argument necessarily ignores completely the first clause of

2  Section 18.18 which could not be more clear where it says that

3  the contract is solely intended for the benefit of the other

4  party and is enforceable or recoverable by the other party

5  only.  Nothing in the "and no other entity" clause changes

6  that.

7       Second, the plaintiff's argument ignores that the "no

8  other entity" clause comes after the conjunction "and,"

9  meaning that it only adds to the third-party beneficiary

10  disclaimer by making clear that the parties intended this

11  disclaimer to be as broad as possible by including this in it

12  the contractually defined term "entity."  Far from limiting

13  the disclaimer of third-party beneficiaries to only entities,

14  it includes entities within a broad disclaimer.  Plaintiff's

15  reading would completely change what 18.18 says.

16       And referring to slide five, Judge, we have inserted

17  here from our brief what the language would have to read of

18  Section 18.18 if the plaintiff was correct.  And as you can

19  see, Judge, if the plaintiff were correct about his reading of

20  "entity," you would have to fundamentally change and alter

21  what the text of Section 18.18 is.  You would have to remove

22  the term "solely."  You would have to remove the term "the

23  other party" and change it to "any party."  You would have to

24  do that twice.  You would have to remove the term "only."  You

25  would have to change "and" to "except."  And you would have to

1  remove the other "other."  Judge, the law does not permit

2  courts to rewrite the parties' contracts in this manner, and

3  that's what plaintiff's reading would require the Court to do.

4       Now, knowing that plaintiff cannot get around the

5  first clause of Section 18.18 and really knowing that his "no

6  other entity" argument is unavailing, plaintiff argued in his

7  Rule 11 opposition that he, and by implication all USAA

8  insureds, are included in the term "party" in the first clause

9  of Section 18.  Now, this was a revealing argument, Judge,

10  because, of course, if they were --

11       THE COURT:  I have denied that motion, right?

12       MR. BURT:  You have denied that motion, Judge.  And

13  I'm just raising the point that they have argued that they are

14  included in the term "party" in the first clause to try to

15  somehow sustain their "no other entity" argument.  But if they

16  were actually included in the term "party," then he would not

17  be a third-party beneficiary at all.  He would be a party to

18  the contract.  So that's fundamentally inconsistent with his

19  claim.  And it's revealing, Judge, because there is no

20  logically consistent way to read Section 18.18 other than to

21  read it as the broad disclaimer that it is and that the

22  parties intended it to be.

23       So the plaintiff's remaining -- their final

24  argument -- and I refer Your Honor to slide six here -- the

25  plaintiff's only remaining argument is that Section 2.1 of the

contract makes him an intended beneficiary because it includes

the clause "on behalf of their customers and clients."

Now, it's important to put in context where this

clause comes within Section 2.1 of the contract.  And we've

highlighted, Judge, where that is.  Section 2.1, as we have

explained in our briefs, merely sets out the services CCC

shall provide and how USAA shall and shall not use those

services.

And what it says, it describes a number of ways in

which USAA shall use the services and defines USAA's business

under that explanation.  And it states, and you can see here

beginning on the second line in what's highlighted on slide

six, it states, "In connection with USAA's business, which,

for purposes of this agreement, shall mean providing vehicle

damage repair estimates, adjusting motor vehicle insurance

claims, and servicing and maintaining motor vehicle insurance

claim records on behalf of their customers and clients and

related management and reporting purposes."

That's the only place, Judge, where this clause "on

behalf of customers and clients" appears.  Now, so the

question is, does that make the plaintiff here an intended

third-party beneficiary under the standards set forth in

*Bochese* and the uniform Florida case law, and the answer is no

and for two reasons.

First, this language cannot and does not negate

1   Section 18.18, the expressed disclaimer intent.  Again, there

2   is no Florida case, not one that has found a plaintiff to be a

3   third-party beneficiary where there is a contractual

4   disclaimer regardless of whatever else the contract says.  And

5   so that's the end of the story on 2.1.

6           But even if Your Honor were to set aside

7   Section 18.18, on its own Section 2.1 does not manifest a

8   specific and clear intent to benefit third parties.  All it

9   does is recognize that USAA and Garrison are in the business

10  of providing insurance services to their customers pursuant to

11  their insurance policies.  It comes as no surprise that the

12  contract states that USAA shall use these products to provide

13  for-fee services.

14          There is no natural reading or plain reading of this

15  clause that expresses a clear and specific intent that the

16  contract intended to confer a direct benefit on all of USAA's

17  and Garrison's insureds, much less an intent that could

18  somehow overcome the disclaimer that's in Section 18.18.

19          Your Honor, this is really similar to these cruise

20  ship excursion operator cases.  And there's numerous of these

21  cases in the Florida law.  In these cases, the cruise ships

22  and the excursion operators have contracts with each other to

23  provide services for cruise ship customers.  And in many

24  instances these contracts are very clear that the cruise ship

25  and the excursion operators are entering these contracts to

 1   spell out how these excursions will be provided, under what

 2   conditions and terms to the customers of the cruise ships.

 3          So although the purpose of the contracts was to spell

 4   out the manner in which these services would be provided, not

 5   one of these cases has found the cruise ship customer to be a

 6   third-party beneficiary even where there isn't an explicit

 7   disclaimer.  And that's the *Sanlu Zhang v. Royal Caribbean*

 8   case from the Southern District in 2019.  That's an important

 9   case, Judge, because there's no specific disclaimer of intent

10   there, and yet the Court held even though the contract was to

11   spell out how the services would be provided to the customers,

12   the customers were not third-party beneficiaries.

13          Ultimately, Judge, plaintiff's argument flips the law

14   on its head.  To believe plaintiff, any reference to a third

15   party, no matter how vague, how obscure, would bestow

16   third-party beneficiary rights even where there are expressed

17   disclaimers to the contrary.  That is exactly the opposite of

18   what the law is, what *Bochese* has held and what the uniform

19   case law on disclaimers has held.

20          For all of these reasons, Judge, and those set out

21   more fully in our brief, judgment under 12(c) is warranted on

22   the third-party beneficiary claim.

23          THE COURT:  All right.  Well, I appreciate those

24   comments.  Let's hear from your worthy opponent on this piece.

25          Mr. Lowther, what says plaintiff?

1          MR. LOWTHER:  Your Honor, contract claims rise and

2     fall based on the language that the parties use in the

3     contract.  Here in the contract itself -- and just step back

4     for a moment because this needs to be analyzed in context,

5     because the intention of the parties in respect to whether

6     third-party beneficiaries are intended is determined by the

7     terms of the contract as a whole construed in the light of the

8     circumstances under which it was made and the apparent

9     purposes that the parties are trying to accomplish.

10          So looking at the purposes of this contract, the

11    fundamental duty of an insurance company is to provide its

12    insureds with benefits that they are entitled to.  Corporal

13    Niemis, and other insureds pay their premiums month after

14    month.  In exchange for those when they do suffer a loss and

15    it is time to receive a benefit, they are entitled to what

16    they are owed.  It is not a starting point for a negotiation.

17    Here they are entitled to actual cash value.

18          CCC's business is to provide actual cash value

19    determinations to insurance companies.  It represents that it

20    will do this as accurately as possible with reasonable

21    methods -- or with reasonable effort.  And it represents to

22    Garrison that this will be the actual cash value, and it can

23    provide up-to-date market valuation.

24          The purpose of this is for Garrison to look to CCC

25    and determine what benefit the insured is entitled to.  That's

the way this happens in practice, and that's specifically what

the contract says.  Section 2.1 of the contract is a

recognition by Garrison and CCC and a directive that USAA --

the contract says USAA, but it includes Garrison -- shall use

the services on behalf of Garrison insureds, on behalf of

means for the benefit and the interest of.  That's the reason

the contract was made.  It was made for the benefit of

Garrison insureds like Corporal Niemis, because when they do

suffer a loss, to determine what it is that they are owed

under the contract.

Now, the defendant cites many cases on the general

standards of a third-party beneficiary claim.  We agree with

the general pronouncement of law.  But in a contract case,

just like in a car wreck case, you have to apply the facts of

the particular case to the law.  Here we are looking at the

specific contract at issue.  And Section 2.1 when considered

in light of the purposes for which the parties made the

contract clearly evidences in plain language an intention to

benefit a class of persons to which Corporal Niemis belongs.

And at no point in the contract do they walk back from this

clearly stated intention.

Section 18.18 applies to entities, a defined term

which means a legal entity that does not include individuals.

The use of the term "no other entity" after the comma, that

"other" there has work to do.  It means that the first part of

1   the purported disclaimer is talking about legal entities as

2   well, CCC, USAA, and its affiliates.  At no point in the

3   contract do USAA and CCC walk back what they clearly stated

4   the purpose of the contract was in Section 2.1.  And as we've

5   seen from the course of performance as plaintiff has alleged

6   as happened in his case is the way this plays out in practice.

7        Garrison looks to CCC to provide actual cash value.

8   CCC is supposed to do that as accurately as possible, but they

9   systemically thumb to scale in favor of the insurer with these

10  improper condition adjustments and cause Garrison to underpay

11  its insureds in breach of their insurance contract and breach

12  of the contract between USAA and CCC to which Corporal Niemis

13  is an intended beneficiary under its plain language.

14        THE COURT:  You're not contending you're a party.

15        MR. LOWTHER:  Your Honor, we are not contending that

16  we are a party.  We are contending that we have rights under

17  this as an expressed beneficiary of the contract.

18        THE COURT:  All right.  They do have -- it says that

19  the obligations are solely intended for the benefit of the

20  other party.  So you're saying of the other party plus

21  third-party people also, see earlier provision, right?

22        MR. LOWTHER:  Right, Your Honor.  We are saying that

23  we are an expressed beneficiary of the contract under 2.1.

24  And to the extent -- and we don't think there's a conflict

25  here.  There is a harmonious way to read these together, which

1  is to give effect to the plain language of 2.1 that Corporal

2  Niemis is an intended beneficiary of this contract and to

3  limit based on the plain language used in 18.18, that that

4  disclaimer, two entities, the defined term in the contract of

5  which Corporal Niemis is not an entity, and we think that the

6  plain language supports this reading.  But were the Court to

7  find that a conflict exists, then we would look to parol

8  evidence.

9        And parol evidence, the way that this contract is

10 performed is consistent with the reading of 2.1 that Corporal

11 Niemis and other Garrison insureds were intended to be

12 third-party beneficiaries of the contract.

13       THE COURT:  All right.  What else do you have,

14 Mr. Lowther?

15       MR. LOWTHER:  Your Honor, on the third-party

16 beneficiary issue, that's it for the moment.

17       THE COURT:  All right.  And I didn't understand.

18 Your colleague argued many other points other than the

19 third-party beneficiary.  Did I miss something?

20       MR. BURT:  Judge, this is Mr. Burt for CCC.  I do

21 intend to argue the tortious interference aspect of the 12(c)

22 motion as well.

23       THE COURT:  All right.  I thought you would have done

24 that at the beginning, but let's hear that.  Unless

25 Mr. Lowther has other points on the third-party beneficiary,

1   we will go back to the defendant on the tortious interference.

2          Anything else, Mr. Lowther, on third-party

3   beneficiary?

4          MR. LOWTHER:  No, Your Honor.

5          THE COURT:  All right.  So back to the defense on the

6   tortious interference piece.

7          MR. BURT:  And, Your Honor, my apologies for not

8   including --

9          THE COURT:  No problem.

10          MR. BURT:  -- this up front.  And you mentioned there

11   will be a brief rebuttal.  I will save my rebuttal to

12   Mr. Lowther's third-party beneficiary points until that time.

13   I just want to make a few brief points.

14          Regarding tortious interference, Your Honor, the

15   question for Your Honor today is again similar, whether

16   plaintiffs produce any facts in discovery to somehow show that

17   he was injured by the CCC market valuation report.  And he,

18   Judge, cannot.  Judgment on the pleadings should be granted on

19   this claim as well.

20          I'd like to refer Your Honor to slide seven regarding

21   the tortious interference claim.  And it's set out in the

22   context right up front here.  We have been talking about the

23   contract between CCC and USAA to this point.  The contract

24   that matters for the tortious interference claim is

25   plaintiff's policy with Garrison.  That's what matters here

1   and what that policy provides.  Because what plaintiff is

2   alleging is that CCC's market valuation report that it

3   provided to Garrison and that states on its face shall be used

4   only by Garrison caused him to receive actual -- to receive

5   less than what he was entitled to receive under his policy

6   with Garrison.

7           Well, so the question is, what is he entitled to

8   receive under his policy with Garrison in the case of a total

9   loss.  And the answer as you can see on slide seven, Judge, in

10  the left-hand box is actual cash value.  There the policy --

11  and this is at Docket 42-2, page 9 of the PDF -- is stating

12  the limit of liability.  And there Garrison expressly limits

13  its liability under its policy with the plaintiff to be actual

14  cash value of the vehicle.  That's the limit.

15          The plaintiff is not entitled to receive 1 cent more

16  under his policy than actual cash value.  Thus, to establish

17  an injury on a tortious interference claim, plaintiff would

18  have to show that he received less than actual cash value for

19  his loss vehicle.  And to do that, he would have to somehow

20  establish that the appraisal, which he fully and freely

21  participated in, did not result in a calculation of actual

22  cash value.  He cannot do this now or after any amount of

23  discovery.

24          And I'd like to refer Your Honor now to the box on

25  the right-hand side of slide seven, the appraisal provision of

1  the policy between Garrison and the plaintiffs.  This

2  appraisal provision is important in two vital respects.  The

3  first is that it recognizes explicitly that the plaintiffs and

4  Garrison might not agree on the amount of loss.  That's that

5  very first clause of the appraisal provision.  It states, "If

6  we and you do not agree on the amount of loss."  That's what

7  the policy says.

8        Now, Mr. Lowther stated in his third-party

9  beneficiary argument that he's entitled to, in the first

10 instance, an offer that satisfies him and reflects his

11 understanding of actual cash value.  That's not what the

12 policy says.  It recognizes that the parties could disagree

13 and might have fundamentally divergent views on what the

14 vehicle is worth.  And so that's the first point that's

15 important here about the appraisal clause.

16       The second point is that it sets out what the

17 procedure is that has to be followed if one party invokes the

18 appraisal provision.  And it states that each party will

19 select a competent appraiser.  The two appraisers will select

20 an umpire.  The appraisers will state separately the actual

21 cash value and the amount of loss.  If they fail to agree,

22 they will submit their differences to the umpire.  And a

23 decision agreed to by any two will be binding.  Each party

24 will pay its chosen appraiser.

25       So that's what -- those are the pertinent provisions

 1    of the appraisal clause, Judge.  And that's precisely what

 2    occurred here.  Garrison, upon learning of the lawsuit,

 3    invoked appraisal.  The plaintiff participated.  The plaintiff

 4    chose his own appraiser.  Garrison chose its appraiser.  And

 5    the two determined what the actual cash value of the vehicle

 6    was.  There's nothing mischievous, untoward, or false about

 7    what occurred.  To the contrary, it's exactly what is supposed

 8    to happen where there is a disagreement as to value, which the

 9    policy recognizes is a possibility.

10         And of course, Judge, it's important to point out

11    that CCC had absolutely no say in any of this.  It's not a

12    party to the policy.  They had no involvement in the appraisal

13    process, no say in what the appraiser determined was actual

14    cash value, and no authority to tell Garrison to pay or not

15    pay on the difference between the settlement amount and the

16    appraisal amount.

17         As we explained in our motion, there are two recent

18    cases out of the Southern District of Florida with a concern

19    that appraisal provisions in insurance contracts determines

20    conclusively the amount of money that a plaintiff is entitled

21    to following an unsatisfactory claims adjustment process.

22    That's the *Bloomgarden v. Allstate* case and the *Bettor v.*

23    *Esurance Property* case, both from the Southern District in

24    2019, and they are cited in our brief.

25         So no amount of discovery can change the fact that

1   plaintiff has received actual cash value.  Garrison paid him

2   the difference between the appraisal and settlement amount and

3   he has accepted it.

4          Moreover, Judge, any tortious interference of

5   contract claim is really a subspecies of a breach of contract

6   claim that exists between plaintiff and Garrison because

7   breach of contract is, of course, an element of a tortious

8   interference claim.  So it's dependent on showing there's been

9   a breach, here a breach of the policy.  Because the policy

10  only entitles plaintiff to actual cash value, and that's what

11  he's received, he cannot show breach or injury in any of his

12  allegations.

13         Now, flipping to slide eight, Your Honor, none of

14  this should come as a surprise.  Your Honor hit on this exact

15  issue in the March conference where plaintiff conceded that

16  accepting the appraisal amount would moot his claim, and he

17  accepted it.  And he further conceded that the amount of

18  damages he's pleaded here is the difference between the

19  settlement amount that Garrison originally paid and the

20  appraisal amount, which is $2,585 which Garrison has paid and

21  plaintiffs have accepted.  And we have highlighted on slide

22  eight, Judge, that portion of the transcript where you asked

23  these exact questions or counsel represented to you that

24  acceptance of the payment would moot the claims and that the

25  total amount of compensatory damages sought, i.e., injury is

1  $2,585.  That's important.

2          What it means is that for purposes of Rule 12(c) is

3  that plaintiff cannot introduce evidence to show that he has

4  been injured.  This case, Judge, is nearly exactly analogous

5  to the Eleventh Circuit's recent decision in *J.P.F.D.*

6  *Investment v. United Specialty.*  That's a 2019 case from the

7  Eleventh Circuit at 769 F. App'x 698.  And we cited this and

8  explained this case in our reply brief.

9          There the Eleventh Circuit specifically rejected,

10  quote, the argument that plaintiff was not required to

11  participate in the appraisal process and that it could sue for

12  failure to pay before the appraisal process and held that the

13  claim accrued only if the insurer refused to pay the full

14  amount of loss as determined by the appraisal.

15          Now, there is some language in this case, Judge, that

16  I think really is critical and on all fours here.  And I would

17  just like to quote it briefly.  The Eleventh Circuit stated,

18  "While the plaintiff is correct that an appraisal award is not

19  a precondition to sue under the policy if there is a

20  precondition for payment of a covered loss where the parties

21  disagree as to the loss amount.  Therefore, any claim for

22  breach of contract -- which is of course the necessary element

23  for a tortious interference claim -- for failure to pay would

24  not accrue until after there was an appraisal award that the

25  insurance company refused to pay.  Because the parties could

not agree, they were required to undergo the appraisal process

and obtain an appraisal award to determine the covered loss

amount and triggered the insurance company's obligation to pay

under the policy.  Only after the insurance company refused to

pay the amount in the appraisal award was the plaintiff's

breach of contract claim approved, closed quote.

THE COURT:  That's J.P.F.D., that's the case you are

citing from?

MR. BURT:  That's exactly right, Your Honor.  And the

pincite on that is 705 through 706.

For those reasons, Judge, plaintiff has no claim of

injury here.  He cannot -- regardless of how long discovery

were to proceed, he could not adduce evidence to show that he

was entitled to anything other than what the policy set forth,

which is actual cash value.  And he has that.  He has it today

in his pocket.  He has no injury.

So knowing all of this, what does he argue?  I will

refer Your Honor to slide nine.  Well, he says in his

opposition brief, well, I haven't received "complete relief"

because CCC didn't make the payment; Garrison did.  And he

identifies a number of other things that he claims is injury,

including the consequential damages in the form of the cost of

appraisal, attorney fees, declaratory and injunctive relief

from prejudgment interest.  That's what he offers as remaining

injury, supposed injury that entitles him to proceed with this

1  case.  None of those points are availing.  And I would just

2  like to offer a brief response to each of them.

3        First, to the argument that CCC did not make their

4  payment, Judge, it doesn't matter a bit that Garrison rather

5  than CCC paid on the appraisal because that's what the policy

6  calls for.  How can there be a breach of a policy or injury on

7  a policy when it is followed to a T?  And it speaks volumes

8  the plaintiff has not sued Garrison for breach here.  And

9  breach is a prima facie element of the tortious interference

10 claim.

11       Further, just because plaintiff chose to pursue a

12 third party rather than his contractual counterclaim does not

13 somehow mean that he can receive actual cash value only if CCC

14 pays for it.  There's no law that holds this and the plaintiff

15 identifies none.  And even where there are joint defendants

16 and they are found joint and severally liable, the plaintiff

17 is entitled only to a single recovery in the amount of injury.

18 He is not entitled to receive that amount twice from each

19 defendant.  That seems to be what he's arguing here.  As a

20 matter of contract, plaintiff is entitled to nothing more than

21 what he has already received.

22       Regarding consequential damages, the cost of

23 appraisal, well, that can't constitute injury on the tortious

24 interference claim because the policy stated, as I've quoted,

25 each party will pay its chosen appraiser.  That's squarely and

1    plain in the contract that plaintiff has with Garrison.  The

2    fact that he had to pay is not surprising or new or anything

3    false or unjust about that.

4           Regarding attorney's fees, well, attorney's fees are

5    not injury.  That's part of a remedy that the plaintiff might

6    be able to get if plaintiff can sustain his claim.  You can't

7    sustain a claim where you have no actual injury and say, well,

8    but I'm seeking attorney's fees.  Attorney's fees are not

9    injury from the tortious interference claim.  And the Supreme

10   Court has made that clear.  In the *Steel Company v. Citizens*

11   *for Better Environment* at 523 U.S. 83, pincite 107, the

12   Supreme Court stated, "An interest in attorney's fees is

13   insufficient to create an Article III case or controversy

14   where none exists on the merits of the underlying claim."

15          THE COURT:  Counsel, give me that cite again.

16          MR. BURT:  Absolutely, Judge.  That's *Steel v.*

17   *Citizens for Better Environment.*  That's 523 U.S. 83 at

18   pincite 107.

19          THE COURT:  All right.

20          MR. BURT:  Now, Florida law is, of course, the same.

21   In Florida, in civil actions parties are not entitled to

22   recover attorney's fees unless the claims for attorney's fees

23   is predicated on a contract between the parties or there's a

24   statute that provides otherwise.  Here there is neither.

25   There is nothing in the policy that states that the prevailing

party is to receive attorney's fees.  And there is no statute

providing for attorney's fees for tortious interference claims

or claims against third parties which are not insurers, and

CCC is not an insurer.  So this cannot constitute injury.

Now, regarding declaratory and injunctive relief,

there is black letter law that declaratory and injunctive

relief are equity remedies, not causes of action.  The

plaintiff has to prevail on an underlying claim in order to be

entitled to either form of relief.  And that's the *Feingold v.*

*Budner* case which we've cited here in our briefs and on slide

nine.  So you can't sustain the tortious interference claim in

the absence of injury by claiming, well, I'm still seeking

declaratory and injunctive relief.

And finally regarding prejudgment interest, well,

plaintiff's own authority that he cites in his opposition

explains that prejudgment interest is not injury.  This is the

*Sos v. State Farm* case that plaintiff cites.  There, the

Middle District in 2020 stated, "The plaintiff shall recover

prejudgment interest as a matter of right if the finder of

fact determines that the defendant is liable and reduces the

plaintiff's injuries to a sum certain."  So only after a

finding of liability, which would include a finding of injury,

is prejudgment interest warranted to make up complete relief.

And here he can't establish liability because he can't show he

was injured in the first instance.  So, Judge, because there

1  is no compensatory damage, no injury, prejudgment interest is

2  not available.  It does not take the place of an injury.

3          So none of these claims the plaintiff has offered in

4  his opposition entitle him or show in any way that he's been

5  injured.  And because he has received actual cash value, and

6  Your Honor knows that based on the pleadings, judgment under

7  Rule 12(c) is appropriate.

8          The final point, Your Honor, that I would like to

9  make is it's just in response to plaintiff's claim in his

10  opposition that even if his own claim fails, he is allowed to

11  proceed on the class claims.  That argument is also

12  unavailing.  He relies on a line of cases dealing with Rule 68

13  offers of judgment and cites the *Stein v. Buccaneers*

14  *Partnership,* an Eleventh Circuit case in 2014.  Judge, these

15  Rule 68 cases are totally in opposite to what's going on here.

16  There is not an offer of judgment made by CCC to the plaintiff

17  here in an attempt to moot out its claim.  What you have was

18  the contractual policies appraisal provisions being followed,

19  which under J.P.F.D. it must be followed before the plaintiff

20  can allege injury.  So it's totally in opposite to these Rule

21  68 cases.  Nothing was done to moot the plaintiff's claim.

22  The policy was followed by the policy's parties, Garrison and

23  plaintiffs.  And Garrison paid actual cash value.

24          So, Your Honor, the proper course here is to grant

25  judgment on the pleadings on both of plaintiffs' claims, not

1  allow him to amend because he can never establish an injury,

2  and dismiss the class claims.

3          Your Honor, those are the points that I'd like to

4  make.  And I'm, of course, happy to respond to any questions

5  and reserve a brief rebuttal to plaintiff's points.

6          THE COURT:  Mr. Lowther, let's talk about this.  Your

7  colleague makes a -- relies on page 9 of this demonstrative.

8  What are your damages exactly?  You agreed to -- I'm sorry.

9  I'm hearing a little bit of an echo.  Can you hear me,

10  Mr. Lowther?

11          MR. LOWTHER:  Yes, Your Honor, I can.

12          THE COURT:  Sorry about that.  I don't know what I'm

13  hearing.

14          You agreed to appraise contractually and you agreed

15  to pay for your side of the appraisal if there is a

16  disagreement.  That happened.  The appraisal resulted in

17  payment to your client.  What's the injury here, the

18  contractual injury, because you are traveling under an

19  interference claim here.

20          MR. LOWTHER:  Yes, Your Honor.

21          The contractual injury is still that Corporal Niemis

22  was owed actual cash value at the time his loss was paid.

23  Because CCC provided a report that systemically undervalued

24  that claim, that caused Garrison to pay less than the actual

25  cash value.  He did not receive the benefit of his contract

1  because of CCC's actions.

2        And I want to discuss briefly when we were here in

3  March, CCC was arguing that Corporal Niemis could not

4  establish injury until he went through the appraisal process,

5  until he paid for a do-over of the work that CCC was supposed

6  to have done, that CCC was contractually obligated to do.

7  Corporal Niemis paid for that do-over.  Garrison paid for a

8  do-over of CCC's work.  And those two appraisers agreed that

9  CCC had given Corporal Niemis the short end of the stick

10 nearly to the dollar of the improper systemic condition

11 adjustment that's being challenged here.

12        THE COURT:  But Corporal Niemis agreed

13 contractually -- I don't know what that sound is.  I hope

14 everyone is on moot except for me and Mr. Lowther.

15        MR. LOWTHER:  It's somebody outside my office with a

16 leaf blower.

17        THE COURT:  No problem.

18        The issue is the contract, okay.  So it's unfortunate

19 he didn't get his money to begin with, but he agreed to a

20 process and agreed to pay for that process if there is a

21 disagreement.  So basically you are just saying he is damaged

22 because he had to follow the contractual guidelines that he

23 agreed to, right?  He said he would pay for an appraiser.  It

24 just seems like that's something that he agreed to and that

25 was part of the risk or part of the contracting parties'

1  proportioned risk hopefully before the fact, and he

2  apportioned but he agreed that he would do that.

3          It's kind of like saying if we have an arbitration

4  agreement, me and you, you know, you're going to teach me how

5  to speak Spanish.  And so we arbitrate and I say, well, you

6  didn't teach me well and I want to sue you.  And you say,

7  well, you agreed to arbitrate.  Well, I may have to pay for

8  the arbitration, but I agreed to -- I'm not following how

9  that's a damage since it was contractually bargained for.  In

10 fact, rather than breach the contract, isn't that the

11 fulfillment of the contract?

12         MR. LOWTHER:  Your Honor, it's not for a few

13 different reasons.  First, unlike the provision in the

14 J.P.F.D. case that CCC cites and which I'll discuss in a

15 moment, the appraisal clause in Corporal Niemis's policy, it

16 is optional.  It's not mandatory.  He was under no obligation

17 to invoke it before he brought the suit in court.  The *Ruby v.*

18 *USAA* decision held that this contractual language does not

19 mandate that an insured seek an appraisal before filing suit

20 is not a current condition to bring a suit in court.

21         Second, it's not a precondition either to Garrison

22 paying on a loss.  The J.P.F.D. decision, I agree it does

23 contain important language, and that's the language of the

24 contract at issue in the case.  It was a homeowner policy, and

25 the contract said we will pay for a covered loss or damages if

1    you had complied with all terms of this coverage part and we

2    have reached agreement with you on the amount of loss or an

3    appraisal award has been made.

4         There was specific contractual language saying that

5    the obligation to pay a loss does not occur until the insurer

6    and insured agree on the amount or go through the appraisal.

7         That's different from the language in the Garrison

8    policy which requires them to pay a loss, and there's no

9    precondition on an agreement or appraisal before the benefits

10   are owed under that policy.

11        THE COURT:  Well, required them to pay a loss.  And

12   if the loss is unacceptable to the recipient, they may invoke

13   appraisal, but the recipient must participate in and pay for,

14   right?  That's correct, isn't it?

15        MR. LOWTHER:  That's correct, between the parties.

16   But --

17        THE COURT:  Hold on.  Between the parties is what

18   counts on your tortious interference claim, because they can

19   only interfere with what the parties agreed to.  If the

20   parties didn't agree to it, there is no interference.  So the

21   parties agreed that the recipient, if he was displeased with

22   the number, the other side could invoke an appraisal that the

23   recipient would pay half of.  So how did they interfere with

24   that?

25        MR. LOWTHER:  Your Honor, they interfered by causing

1  him to receive less than the actual cash value he was entitled

2  to in the first place.  But for CCC's interference of this

3  contract, he would have received the actual cash value of his

4  loss vehicle at the time that his benefit was paid.  But for

5  CCC's provision of a valuation report that is in favor of the

6  insurance company, Corporal Niemis would have received actual

7  cash value.  There would have been no need for him to pay out

8  of pocket to conduct an appraisal.

9        And, Your Honor, this systemic adjustment, we are

10 talking about real money in people's pocket at a time when

11 they need the benefit of their insurance contract.  This is a

12 wrong that really the appraisal provision cannot correct

13 because CCC is just causing these people to have to pay more

14 money to receive something that they are entitled to receive

15 in the first instance.

16       And here the appraisers, both of them agreed nearly

17 to the penny of the condition adjustment challenged here that

18 Corporal Niemis did not receive the benefit of his bargain.

19 And CCC caused that injury, and there are still remedies to be

20 provided here.  There is declaratory relief that CCC's conduct

21 resulted in the underpayment of actual cash value.  There is

22 prejudgment interest which is a requirement of compensatory

23 damages under Florida law.  And there is also --

24       THE COURT:  Right.  But you agree with me that in

25 order to get prejudgment interest, there has to be a finding,

1  underlying finding of breach or obligation, right?  You just

2  don't get it for delay.  You have to have a successful cause

3  of action and then you get it, right?

4       MR. LOWTHER:  Your Honor, you have to have a

5  successful cause of action.  And here not only have we pleaded

6  damages, we also have evidence that Corporal Niemis was

7  damaged.  He was owed actual cash value when his claim was

8  paid in June of last year.  He did not receive that actual

9  cash value based on CCC's conduct.  And he is entitled to

10 prejudgment interest on that date forward.

11      THE COURT:  Okay.  So why then wouldn't Garrison --

12 just hypothetically Garrison would be liable too, right?  I'm

13 not saying there is anything wrong with you not suing them.

14 So what you are saying is then on that date, June or whenever

15 it was it paid, Garrison's liable also, right?

16      MR. LOWTHER:  Yes, sir.

17      THE COURT:  Notwithstanding the appraisal provision

18 which Garrison invoked, Garrison is liable from the get-go

19 because they paid less than they should have.

20      MR. LOWTHER:  That's correct, Your Honor.  And there

21 is no requirement in the contract.  And the *Ruby* court, other

22 courts interpreting the USAA contract, it is not a requirement

23 that the insureds first seek an appraisal.

24      THE COURT:  Right.  Okay.  Go ahead.

25      MR. LOWTHER:  Your Honor, also with respect to these

claims, we believe that we have -- we have pleaded and we have

demonstrated injury through two appraisers.  But in addition,

even if Garrison's payment to Corporal Niemis does not include

prejudgment interest, it does not include any kind of

declaratory relief or judgment against CCC.  Even if that

somehow mooted plaintiff's individual claim, which it did not,

the class claims would go on.  Corporal Niemis brought this as

a class action.  The class has received no relief here.  And

under Eleventh Circuit law, there remains a case or

controversy under *Stein* even if the named plaintiff's claims

were somehow to become moot after the case was filed.

THE COURT:  All right.  What else do you have,

Mr. Lowther?

MR. LOWTHER:  Your Honor, unless you have any

specific questions about anything, that concludes my argument.

THE COURT:  Well, thank you very much.

Okay.  Back to the defense for a very brief rebuttal

on these points, and then we'll go to the discovery motion.

MR. BURT:  Thank you, Your Honor.  And, yes, very

brief.

Regarding the tortious interference argument we just

heard, two points.  First, the J.P.F.D. case is controlling

here.  Everything that Mr. Lowther just said are the same

claims that were raised in J.P.F.D. where the homeowner there

said I was entitled to receive an offer in the first instance

1  that satisfied me and what I think my loss amount was.  And

2  the Court rejected that.  It rejected it flat out.

3          And it's the same thing here.  The appraisal

4  provision in the policy recognizes explicitly that the parties

5  might not agree.  And once the party invokes, the appraisal is

6  binding.  That's what the contract says.  And that disposes of

7  his argument.

8          Now, Judge, I just want to make -- going back to the

9  third-party beneficiary argument very briefly, just checking

10  my notes here, the only points I want to make there, Your

11  Honor, regarding what we heard from Mr. Lowther and his

12  interpretation of Section 2.1 and Section 18.18, again, his

13  interpretations are exactly contrary to what the plain

14  language actually states.

15          And even if Your Honor were to find any level of

16  ambiguity in what those provisions state, that would mean that

17  he is not a third-party beneficiary because ambiguity is

18  fatal.  Under *Bochese* the intent must be clear and

19  specifically expressed, and it is not here.

20          So, Judge, for all of the reasons that we explained,

21  there is no third-party beneficiary claim that can survive

22  12(c).  And the tortious interference cannot survive 12(c)

23  either.  Corporal Niemis got all that he was entitled to get.

24  He got actual cash value.  He has that in his pocket today.

25  He accepted it.  There is nothing in the law that says or in

1  the policy that says he was entitled to receive an offer that

2  he agreed with in the first instance and that there could be

3  no disagreement.  The policy says exactly the contrary.

4       The parties might not agree, in which case either

5  party can invoke.  And if they invoke, the process is binding.

6  It is binding.  He has actual cash value, and that's the end

7  of the story.

8       Thank you, Your Honor.

9       THE COURT:  Very good.  Well, I appreciate those

10  arguments.

11       Okay, Mr. Lowther.  We have your motion to compel at

12  Document 53 with the response at 64 and a reply at 66.  I will

13  hear you now on that, please.

14       MR. LOWTHER:  Yes, Your Honor.

15       As we've alleged throughout the complaint and as

16  we've discussed here, this is a simple case in which we allege

17  that CCC did not inspect the condition of the comparable

18  vehicle and just made a blanket assumption that all those

19  vehicles were in a better condition than the loss vehicle, an

20  improper assumption which the two appraisers in this case who

21  were hired to conduct a do-over of CCC's work did not

22  themselves make.

23       The discovery that we saw in this case is targeted to

24  those allegations.  It's targeted to policies and procedures

25  which would include how Corporal Niemis's valuation report was

conducted and is targeted to material about the relationship

between CCC and Garrison which are relevant to the

relationship during the time that Corporal Niemis's total loss

is valued.

        And specifically, we really just want to bring paper

discovery to a close here so that we know the universe of

documents we have and can proceed expeditiously with a

30(b)(6) deposition and a deposition of a Garrison employee.

But because of the thicket of objections that we have received

and because we have no indication about what documents are

being withheld responsive to discovery, it's difficult, if not

impossible for us to know in the first instance whether CCC

actually did inspect the comparable vehicles in Corporal

Niemis's report.  We had doubts that they did, but they had

not produced documents one way or the other or confirmed that

the documents do not exist.

        And similarly, we don't know how they came up with

the specific $2,585 condition adjustment that they assumed all

comparable vehicles were in better than Corporal Niemis's loss

vehicle.  Now, these are the core allegations.  This is a

simple case.  But we do need discovery to prove this case and

we had -- I think our reply makes very clear where we stand on

these.  We sought very targeted production.  And CCC's

characterization of these as boundless misses the mark in

light of what it is we actually seek here.

1          So for a response to request for production Number 1,

2     CCC says that it now has produced all data concerning

3     plaintiff's total loss valuation report.  If this is true,

4     then they need to supplement their request and state this is

5     all we have.  If not, then they need to produce the documents

6     that are responsive.  And if CCC has produced everything it

7     has, then it confirms they have no documentation that they

8     inspected the comparable vehicles used in Corporal Niemis's

9     total loss report and they have no documentation to support

10    the amount of the condition adjustment applied to each of

11    those comparable vehicles.  So that's request for production

12    Number 1.

13          And, Your Honor, do you want me to go through each of

14    these in detail?

15          THE COURT:  No.  I think a more general overview

16    which you are giving me is helpful.  And then once I decide

17    where we're going to go on that, I will just dig into each

18    one.

19          Now, I will say this.  I know your expert report is

20    due July 5.  And what I intend to do, because we need some

21    time to look at this, is right now I'm just going to move

22    every deadline in this case out 30 days, just frankly so I can

23    study up on this and get something done here.

24          So I think that the higher level that you are giving

25    me now is very helpful.  I don't think we need to dig into

1   Number 29 at this point.  So if you want to give me the

2   principles behind your -- without getting into each individual

3   one, sort of principles behind your -- as you are doing now,

4   that would be very helpful.  But I'm going to take the thing

5   off the boil slightly right now.

6          And then of course if y'all need more time after

7   that, that's fine too.  I'm not a rocket-docket place.  This

8   will at least take the boil off the thing because your expert

9   report is due pretty much next week if we think about the

10  July 4 holiday.  So I'm going to move everything back 30 days.

11         So go ahead at this level.  It's helpful to me very

12  much, Mr. Lowther.

13         MR. LOWTHER:  Okay.  Yes, Your Honor.

14         And I appreciate your raising the expert report

15  deadline.  That's something I was going to bring up during

16  this hearing.

17         Request for production Number 6 and 7 is the

18  marketing and materials that CCC and Garrison exchanged

19  concerning CCC's services.  These are materials in which CCC

20  pitches its services.  Perhaps we can save you money on actual

21  cash value to your insured, materials that would show the

22  intent, the purpose behind the contract, one of the elements

23  of a third-party beneficiary claim, the purpose for which the

24  contract was entered, the purpose the parties were trying to

25  achieve.  And CCC concedes that these are relevant materials

now, but it just now says we will only search during the

statute of limitations.  This is insufficient.  They have not

put forth any evidence showing why it would be burdensome for

them to look back X further.  The timeline of their

relationship defines the scope of production here.  And there

is nothing in the record that it would be unduly burdensome

for CCC to produce these materials that they concede are

relevant.

        In general, Numbers 9, 11, and 13 deal with the

methods, the policies and procedures for adjusting both loss

vehicles and comparable vehicles as well as any documents

about whether CCC considered any kind of appraisal standards

in determining the way it adjusts condition of comparable

vehicles is appropriate.

        These all go to the issue of what the justification

is for how they determine that all comparable vehicles can be

presumed without inspection or documentation to be in a better

condition than loss vehicles as well as adjusting the loss

vehicles.

        We know that CCC puts those vehicles under a

microscope.  And the standards by which it held Garrison,

shared with Garrison you should inspect the loss vehicles to

determine its condition is relevant because it stands in

juxtaposition to the lack of any inspection done to the

comparable vehicle and further demonstrates why under proper

1    appraisal standards such as what the appraisers did in this

2    case and such as our expert will testify are inappropriate.

3    You must inspect comparable vehicles too and document the

4    inspection in order to determine whether a condition

5    adjustment is appropriate.

6            Also for Numbers 9 and 11, I do want to emphasize

7    that the policies and procedures that we are seeking are the

8    ones that were in effect at the time plaintiff's evaluation

9    report was prepared.  We do understand and have been following

10   the Court's order that we are discussing -- or that we are

11   doing discovery on Corporal Niemis's claim at this time.

12           And in brackets beneath request 9 and 11, we

13   specifically restrict the discovery at this stage to those

14   policies pertinent to Corporal Niemis's claim.

15           THE COURT:  All right.  What else do you have on that

16   motion, Mr. Lowther?

17           MR. LOWTHER:  Your Honor, right now I take it that

18   you do not want to discuss Number 29 right now from what you

19   just said.

20           THE COURT:  Hold on.  No.  I just used that as an

21   example.  So no, please feel free.

22           MR. LOWTHER:  So the request for production 29, one

23   of our claims for damages is CCC instigated the appraisal

24   provision.  CCC claims a privilege of its communications with

25   Garrison's counsel concerning Corporal Niemis in this action

1  and the appraisal that Garrison ultimately tried to compel

2  Corporal Niemis to participate in.  And there is no

3  justification that CCC has provided whatsoever for the basis

4  of the privilege.  Instead it cites the United HealthCare case

5  that is really unclear, but they seem to be using -- to stand

6  for the proposition that communications between attorneys for

7  a party and a third party are always privileged.  But in that

8  case the claimant of the privilege actually put forth evidence

9  for in camera review.  They proved the privilege.  And CCC has

10 done nothing to prove that there is any privilege between

11 communications between its counsel and Garrison's counsel,

12 communications that perhaps ordinarily would have just

13 happened between a CCC employee and a Garrison employee that

14 they chose to channel through counsel.  There is no basis in

15 the record for a finding that those are privileged

16 communications.  CCC has provided none.

17      And if it is withholding communications, I believe

18 that these are waived because it hasn't properly asserted the

19 privilege.  But it needs to at least provide a basis so that

20 we can assess whether the privilege is proper.

21      THE COURT:  I'm not really big on waiver any more

22 than I'm big on Rule 11 stuff.  So what I might do -- and we

23 will hear from Mr. Chipev in a moment.  I might require a

24 privilege log.  And then I think one generally is required

25 anyway when you assert privilege.  And then if I decide, you

```
 1   know -- it may well be we don't know.  It may well be that
 2   they have a joint interest, the contractor or the other.  And
 3   if there is communication between counsel, it may fall into
 4   that privilege.
 5           You know, judges are very reluctant to require
 6   production of confidential lawyer letters or lawyer emails.
 7   We're not there yet.  FYI, I'm not a big procedural default
 8   waiver Rule 11 judge.
 9           All right.  That's 29.  What else, Mr. Lowther?
10           MR. LOWTHER:  Your Honor, I understand your point,
11   the point on waiver.  And we really are just interested in
12   knowing the basis for the privilege and whether any documents
13   are being withheld.
14           THE COURT:  Sure.
15           MR. LOWTHER:  We understand there is no basis right
16   now for us to make the determination one way or the other.
17           THE COURT:  I hear you.  Okay.  What else do you have
18   on the motion?
19           MR. LOWTHER:  Your Honor, unless you have any
20   specific questions at this time, that concludes my comments.
21           THE COURT:  You know, while you were so ably arguing,
22   of course I picked up -- I have a paper calendar that is a
23   little more objective, shows a broader spread.  I'm going to
24   take a week off, just to be candid here, a week off for the
25   July 4 week.
```

 1           In my view, especially if I have to do a privilege

 2    review or maybe send it to the magistrate who will probably do

 3    it, maybe I need to move the schedule back 60 days.

 4           Do you -- Mr. Lowther, can you tell me whether you

 5    object to that if I moved every date back 60 days?

 6           MR. LOWTHER:  Your Honor, no, no.  I don't object to

 7    that.  We still have -- we still have a 30(b)(6) deposition as

 8    well or deposition notice and just received objections last

 9    night.  So we might have things to work through there as well.

10    So we don't object to the 60 days.

11           THE COURT:  And I presume you would rather have -- if

12    you are going to get some more discovery here through me, you

13    would like to have that in your quiver, so to speak.

14           All right.  Well, we will ask -- let's don't hang up

15    before Mr. Burt or Mr. Chipev will let us know their position

16    on the 60 days, just set aside for every date here, including

17    trial, certification and all that.

18           All right.  Mr. Chipev, you're up.  Why isn't

19    Mr. Lowther right?  Broad discovery.  I know we talked about

20    only on the Niemis claim, but it's pretty broad in federal

21    court.  So let's hear what you have to say on this motion.

22           MR. BURT:  Your Honor, this is Mr. Burt.  If I may

23    make one comment before Mr. Chipev delves directly into that

24    question.  I just want to state for the record CCC of course

25    also does not object to the 60-day extension on all deadlines.

1  And I would just like to offer one possible suggestion.  Of

2  course if the 12(c) is granted, that moots all of this.

3         If it is not granted, it might make sense, and I'm

4  not saying this has to happen, but it might make sense for the

5  parties to meet and confer about whether just to proceed into

6  class discovery at that point and move towards the class

7  certification deadline because, A, that might moot a lot of

8  these issues, because I think a lot of these issues do

9  surround the limitation that Your Honor imposed on just

10  Corporal Niemis's claim.  So that's one suggestion, Judge.

11         If it is denied, that the parties meet and confer,

12  whether it makes sense to proceed directly to class

13  certification and let Your Honor know the parties' position on

14  that.  I just wanted to make that point for the record for

15  consideration of Mr. Lowther and Mr. Bates and Your Honor.

16         THE COURT:  That's well taken.  I will let you all

17  inform me of that if we reach that point.

18         So I will ask Ms. Olden who runs the show around here

19  to extend every date 60 days.  And then of course my staff and

20  I will need to get to work on all these points.

21         All right, Mr. Chipev.  What say you?  Why isn't

22  Lowther right here?

23         MR. CHIPEV:  Thank you, Your Honor.

24         Just briefly, I think the motion to compel should be

25  denied in its entirety for at least two straightforward

1  reasons.  And I'll direct your point second.  But first is

2  plaintiff has just failed to meet and confer with us in good

3  faith for the last few months on this motion.  The letters and

4  the correspondence that we submitted with our opposition and

5  that were included in some form in Mr. Bates's declaration

6  make that clear.  The last and the only time that we

7  substantively discussed discovery with plaintiff's counsel

8  telephonically was on April 9, which was about a week after we

9  served our objections and responses.  And since then, while we

10  got one letter from plaintiff's counsel on April 19 following

11  up on their positions, they have refused to engage with us

12  meaningfully.

13        We sent a comprehensive letter on April 29 setting

14  forth our positions with respect to discovery and numerous

15  questions that we raised to them to help clarify their

16  positions and the scope of any dispute.  And despite our

17  repeated requests throughout the month of May and to the

18  beginning of this month to discuss those issues and to

19  solidify any disputes or move forward, they have just refused

20  to actually engage.

21        I think that's underscored by the fact that they

22  filed the motion while we were in the process of producing

23  additional materials in response to the first request for

24  production.  We had an outstanding correspondence with one of

25  Mr. Lowther's colleagues on that issue.  And they didn't even

1    wait for that response.

2            I think the fact is that they rushed here to get this

3    motion in front of you before a ruling on CCC's dispositive

4    motions, and we just think that's not what the local rules and

5    your preferences require.

6            THE COURT:  Yeah, although their expert disclosure is

7    due here in less than two weeks, and I'm not going to fault

8    them.  You guys are not exactly shooting off warm and fuzzy

9    vibes with your Rule 11 motion either.  So I think given the

10   deadlines that I imposed in this case they didn't have a whole

11   lot of headroom time wise.

12           How about on the merits?

13           MR. CHIPEV:  Understood.

14           So I think the main thing on the merits here is what

15   plaintiff has both in his opening brief, his reply brief, and

16   in this argument is ignored the directives that we are

17   deferring class consideration until the plaintiff's claim can

18   be addressed and that only nonclass discovery may commence as

19   to Mr. Niemis's claims.  And that was Docket Number 38.

20           There are numerous other deficiencies in the RFPs

21   that we believe justify our objections, which we certainly

22   don't agree are boilerplate.  But the scope of what the

23   plaintiff is looking for, even though he tries to couch it in

24   the context of his individual claim, is basically any and all

25   documents and data about how CCC values total loss vehicles.

1    Its practice is nationwide, over 13 years of discovery

2    including ESI about CCC's relationship with Garrison and USAA.

3            And just to underscore that, on page 11 of Exhibit G

4    to my declaration, which is docket Number 64-8, this is the

5    30(b)(6) notice that was served on my client.  And while it's

6    not at issue in this particular dispute, just as an example of

7    what they think is proper right now for discovery are topics

8    7 and 8, which ask about our knowledge of whether and what

9    circumstances CCC's competitors apply condition adjustments

10   and CCC's use of condition adjustments in other jurisdictions.

11   Those are the types of topics that plaintiff states are

12   relevant and proportionate to discovery as to his claim.

13           We just fundamentally disagree on that.  It is this

14   type of discovery that goes far beyond the "simple case" that

15   Mr. Lowther keeps claiming that it is.  And this claim is all

16   the more simple because the contract is clear that he is not a

17   third-party beneficiary and he has accepted the appraisal

18   valuation that was agreed to by the appraisers.

19           So throughout what we've done is we've properly

20   limited the scope of what we would agree to produce, what we

21   think is relevant and proportionate to plaintiff's simple

22   claim.  And that's what Rule 26(b)(1) requires.  It has to be

23   relevant to the claim, proportional to the needs of the case.

24   And within that context you take into account the issues at

25   stake, the amount in controversy, less than $3,000 as to his

claim, the parties resources and the importance of the

discovery in resolving the issues.

And what we've done in our productions is provide

them with the necessary information to prosecute plaintiff's

claim.  We haven't produced nothing.  They have copies of the

MVR.  They have certain data that CCC maintains related to

that particular valuation report.  They have an entire claim

file that CCC maintains as part of the suite of services that

it provides to Garrison for its insureds.

They also have documents like a condition matrix that

explains -- that provides guidelines that Garrison's

evaluators can use to determine the condition of the loss

vehicle.  They have information about what the condition

adjustment is, how it works.  They have information about

CCC's comprehensive nationwide process for inspecting

comparable vehicles on dealer lots by field inventory

representatives.

And I'll note that this is something that no other

entity that provides these type of valuation services do.

It's not required by the law or anything like that.  So we

have given them what we think is reasonable and proportionate

discovery.  They want things -- they want a whole host of

other materials that go far beyond that.

And looking at particular RFPs that Mr. Lowther is --

with respect to the first one, what we have produced are these

1  claims files, documents about CCC's processes and its robust

2  system that it uses to ensure the quality of its valuation and

3  the quality of the comparable vehicles used in the report.

4         Now, Mr. Lowther and Mr. Bates will be free to

5  explore questions with CCC's 30(b)(6) designee about how the

6  valuation worked in the context of plaintiff's claim.  But the

7  full scope of what they are looking for goes far beyond simple

8  individual claimed discovery.  It touches on things about the

9  class.  And I'm not saying that they won't be entitled to more

10 that we may have if we get to the plaintiff class discovery,

11 but when we are looking at it from the context of

12 reasonableness and proportionality and relevance, that's how

13 we have approached it.

14        With respect to the contract-related materials in

15 CCC's relationship with Garrison, which is RFPs six and seven,

16 we have produced the contract.  We have agreed to produce

17 documents, if they exist, that are sufficient to show the

18 request for proposals, our responses thereto and other

19 presentations or materials.  We think it's completely

20 appropriate to limit that to the statute of limitations right

21 now which goes back several years.

22        And one of the reasons for that is that this contract

23 was amended in 2017.  Plaintiff has a copy of that amendment.

24 So it is -- there is no reason to look all the way back to

25 2006 and 2011 to find the parties' understanding of the

1    particular provisions and what the relationship is because

2    what's relevant is what had happened within the timeline of

3    plaintiff's claim.

4           So materials about how the parties understood the

5    third-party beneficiary clause are also not relevant for all

6    of the reasons that Mr. Burt explained.  And we think that

7    even though we haven't calculated the specific cost of how

8    much it would be to do a comprehensive ESI search, it just

9    stands to reason we would be looking at multiple custodians

10   and 13, 14 years of documentation in email and other form.

11          And we cited in our briefs *Small v. Amgen,* 2016 WL

12   7228863.  That's from the Middle District in 2016.  And the

13   Court there agreed with the position by one of the parties

14   that, you know, it was -- they didn't have to actually have a

15   calculated comprehensive or exact estimate of the cost.  The

16   scope of the requests in and of themselves compel the

17   conclusion that they were unduly burdensome.  So that's how

18   we're viewing it with respect to those.  We think we should

19   start with the recent years, the recent amendments.  And then

20   if there is a justification to go beyond that, we can have

21   that conversation with the other side, but that's where we

22   should start in the first instance.

23          With respect to RFPs 9, 11 and 13, on 9, Garrison is

24   the entity that evaluates the condition of a loss vehicle.

25   CCC doesn't have any control over that process.  It takes what

1    Garrison states as to the condition as true.  We've produced a

2    matrix that explains the different classifications of

3    condition Garrison can use, and that's it.  And we don't think

4    that there is anything more that's proportionate for document

5    discovery for plaintiffs to prosecute his claim.

6            On 11, we have agreed to and have produced documents

7    sufficient to show how the condition adjustment works and what

8    it is, how its valuation request is submitted, how to read the

9    MVR.  As we would have explained to plaintiff if we had met

10   and conferred, this idea that there are some other documents

11   out there that show how this exact number was calculated, like

12   the inputs for that particular condition adjustment and his

13   MVR misunderstands CCC's system, which is a computerized

14   system with specific algorithms running many valuations a day.

15   We've turned over the data we have with respect to that

16   particular evaluation.  But opening up the door to any and all

17   documentation about CCC's valuation generally again goes

18   beyond the scope of individual discovery.

19           On 13, which is about standard appraisal practices, a

20   lot of our objections there are that plaintiff hasn't properly

21   defined what he means by "conform" and "standard," even though

22   they are assuming that such materials may exist.

23           Just an example of why we think that's confusing, you

24   can take the two appraisals that occurred here.  One was by

25   plaintiff's appraiser who despite all of Mr. Lowther's

1  comments about physical inspection, it literally just took

2  CCC's valuation and removed the condition adjustment to the

3  comparable vehicles from the valuation.  He didn't do any

4  physical inspection of any comparable vehicles.  He didn't

5  look at anything specific.

6       And when we subpoenaed him for guidelines and such

7  that he supposedly uses in his practice, he didn't produce

8  anything.  Garrison's appraiser, meanwhile, used vehicles from

9  Texas.  So while we are not challenging the appraisal

10  valuation, that just goes to show what is standard and what

11  conforms is vague and ambiguous, and the plaintiff just hasn't

12  defined it.

13       And I want to underscore there that nothing in

14  Florida law requires that CCC follow a specific appraisal

15  practice, inspect specific vehicles.  It's a software company

16  with a methodology for valuing total loss vehicles.  As

17  Garrison takes that information and does something with it is

18  up to them.  So this whole question of conformity is

19  approaching it from a false premise, a false assumption, and a

20  false legal conclusion.

21       And finally on RFP 29, I want to be very clear here.

22  We have produced every responsive document that our client

23  possesses with respect to correspondence with Garrison about

24  plaintiff's claim.  We haven't withheld anything.  What we

25  have done, however, is that we have refused even in the first

instance to search any correspondence that Latham may have had

with Garrison's outside counsel because we are focused on an

objection that that information is not relevant, it is not

proportional.  And the fact that it may have something

responsive is speculative whatsoever.  It is improper for them

to try to demand for us to produce a privilege log where we

don't even agree that the materials that they are seeking are

responsive in the first place.

        And just to underscore this -- I know Mr. Lowther

made a point about whether we instigated the appraisal or not.

First of all, the complaint obviously isn't premised on CCC

somehow tortiously interfering with plaintiff's policy by

asking Garrison to compel it to invoke appraisal.  That's CCC

actually asking Garrison if it even occurred to allow the

policy provisions to play out.  So I don't even know how you

get to tortious interference there in a breach of contract.

        But either way, our client doesn't have such

communications with Garrison, and that's what's relevant.

They want everything about this action that we may or may not

have had with Garrison's outside counsel.  There is no

relevance to that.  That's not going to prove their

third-party beneficiary claim.  It's not going to remotely

lead to discovery that's admissible evidence or otherwise as

to their tortious interference claim.  And that's why there

isn't a privilege log here because we aren't even at the point

1  of withholding based on any privilege, work product, common

2  interest or other protection.  We are refusing to produce in

3  the first instance because it's not responsive and proper

4  under Rule 26.

5          If the Court has any specific questions, I'm happy to

6  address them.

7          THE COURT:  No.  I do have a question back for

8  Mr. Lowther on your point on Number 29.

9          Mr. Chipev, thank you for your presentation.  I have

10 been taking notes.

11         Mr. Lowther, why don't you button up on this motion.

12 But on 29, the one point that Mr. Chipev says is that your

13 request is documents exchanged between you and Garrison, you

14 being CCC, right?  I assume.

15         MR. LOWTHER:  Well, Your Honor, we asked for

16 communications through counsel as well.

17         THE COURT:  Where is that?  I don't see that.  You

18 did?  And I'm looking at -- I'm probably looking at the wrong

19 thing.  I'm just looking at Exhibit C to Document 53.

20         MR. LOWTHER:  Yes, Your Honor.  In the definition

21 section of our request, we define "you" in a way that would

22 include counsel.

23         THE COURT:  Okay.

24         MR. LOWTHER:  And, Your Honor, also to make one more

25 point.  In the discovery that CCC served on Corporal Niemis,

1  you know, they also asked for documents between us, being

2  plaintiff's counsel and Garrison's counsel, relevant to the

3  claims of this lawsuit which we produced.

4       THE COURT:  All right.  That was my question on 29.

5  All right.  Mr. Lowther, why don't you button up for us

6  briefly if you have any concluding brief rebuttal to

7  Mr. Chipev.

8       MR. LOWTHER:  Your Honor, one thing I would like to

9  say is that if CCC is finished with its production, if it has

10  produced everything that it intends to use to justify how it

11  applies condition adjustments in this case and it's going to

12  depend on the documents produced, I'm fine with that.  We just

13  need a clear record because I don't want to prepare an expert

14  report based on the production which they say is all I need.

15  That's not their call to make, but that's what they're saying

16  here.  I don't want to see anything else later in this

17  litigation saying, no, this is really how we do it and we did

18  go and physically inspect the condition of the vehicles used

19  in that report.  Now is the time to do that.

20       They say this bleeds into class discovery.  We have

21  alleged that Corporal Niemis's claim is typical of the class.

22  We are seeking discovery on the merits of his claim, which is

23  relevant to other people's claims too, but it is proof of his

24  individual claim.  And that's where we are at this stage of

25  discovery.

1           THE COURT:  All right.

2           MR. LOWTHER:  We have expressly limited our discovery

3    to his individual claim.

4           THE COURT:  Does that conclude your comments,

5    Mr. Lowther?

6           MR. LOWTHER:  It does, Your Honor.

7           THE COURT:  Well, thanks everybody.

8           MR. BURT:  Your Honor, can I just briefly make just

9    one response?

10          THE COURT:  Well, then we are going to have to go

11   back to Mr. Lowther.  The word is brief, yes.

12          MR. BURT:  Just briefly.

13          We are open and as we have been for months to meet

14   and confer with the plaintiff on whether there is anything

15   else that we can produce here that is relevant and

16   proportional, that we think that we have complied with our

17   discovery obligations, but I'm not saying that there aren't

18   other documents here that generally discuss the condition

19   adjustments and what they are and how they work.

20          Our position is that we think that as to plaintiff's

21   claim we have complied, but it is very possible that we could

22   reach some agreement that makes this reasonable and

23   proportional and addresses both sides' concerns here without

24   the Court's intervention.  I just wanted to make that clear.

25          THE COURT:  Thank you for those comments.

```
 1              Anything else, Mr. Lowther?

 2              MR. LOWTHER:  Your Honor, I mean, this is the

 3     problem.  We are now hearing that there are more documents.

 4              THE COURT:  All right.  I have a motion before me.

 5     We are not going to ping-pong back and forth whether there is

 6     other stuff.  I will certainly -- the portions of the motion,

 7     if portions there be that I grant, we will make that

 8     abundantly clear.  And of course, some of this is my fault

 9     because I did restrict the discovery to the individual claim

10     pending this appraisal completion, etc.

11              That aside, Mr. Lowther, you have concluded your

12     rebuttal comments?

13              MR. LOWTHER:  Yes, Your Honor, I have.

14              THE COURT:  All right.  Well, thank you, everybody.

15     I appreciate a very high level of lawyering.  And I don't --

16     I'm not trying to talk in the empirical "we," but I have a

17     small law firm here.  And several lawyers and I will put our

18     heads together and we will work very diligently on getting

19     something out and at a level that you have shown as advocates.

20     We will try to get up to that level also.

21              So for a moment at least the hot boil is off the case

22     and we'll move every single date, including pretrial and trial

23     and certification, all that back 60 days.

24              Anything else from the plaintiff?

25              MR. LOWTHER:  No, Your Honor.
```

1          THE COURT:  For the defense, anything else?

2          MR. BURT:  No, Your Honor.  Thank you for your time

3    this morning.

4          THE COURT:  Thanks, everybody.  I appreciate it.  We

5    will get to work.  Over and out.

6       (Proceedings concluded at 11:04 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT   )
                                  )
2  MIDDLE DISTRICT OF FLORIDA     )

3

## REPORTER TRANSCRIPT CERTIFICATE

4

5       I, Tracey Aurelio, Official Court Reporter for the United
   States District Court, Middle District of Florida, certify,
   pursuant to *Section 753, Title 28, United States Code*, that
6  the foregoing is a true and correct transcription of the
   stenographic notes taken by the undersigned in the
7  above-entitled matter (Pages 1 through 60 inclusive) and that
   the transcript page format is in conformance with the
8  regulations of the Judicial Conference of the United States of
   America.

9

10                                 /s    *Tracey Aurelio*
                                   _____
11                                 Tracey Aurelio, RMR, RDR, CRR
                                   Official Court Reporter
12                                 United States District Court
                                   Middle District of Florida
13                                 Tampa Division
                                   Date:  6/25/21
14

15

16

17

18

19

20

21

22

23

24

25